1  Stuart M. Richter (CA 126231)
   stuart.richter@kattenlaw.com
2  Gregory S. Korman (CA 216931)
3  gregory.korman@kattenlaw.com
   Paul A. Grammatico (CA 246380)
4  paul.grammatico@kattenlaw.com
5  **KATTEN MUCHIN ROSENMAN LLP**
   515 S. Flower St., Suite 1000
6  Los Angeles, CA 90071-2212
7  Telephone:   213.443.9017
   Facsimile:   213.443.9001
8

9  Attorneys for defendant, Allied Interstate, LLC

10          **UNITED STATES DISTRICT COURT**

11         **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 12  Henry Mendoza | Case No. 8:17-cv-00885-JVS-KES |
| 13  ,   Plaintiff, | Hon. James V. Selna |
| 14      v. | **Declaration of Paul A. Grammatico in** |
| 15  Allied Interstate, LLC, | **Support of Allied Interstate, LLC's** |
| 16      Defendant. | **Opposition to Plaintiff's Motion for Partial Summary Judgment** |
| 17 | [Filed Concurrently with Memorandum |
| 18 | of Points and Authorities in Opposition, |
| 19 | Statement of Genuine Disputes Pursuant to Local Rule 56-3, and |
| 20 | Evidentiary Objections to Plaintiff's Motion] |
| 21 | |
| 22 | Date:        October 21, 2019 |
| 23 | Time:        1:30 p.m. Place:       Courtroom 10C |
| 24 | |
| 25 | Complaint Filed:  May 19, 2017 Trial Date:       December 10, 2019 |

26

27

28

**DECLARATION OF PAUL A. GRAMMATICO**

I, Paul A. Grammatico, hereby declare:

1.     I am an attorney at law, licensed to practice before all of the courts of the State of California and admitted to practice before this Court. I am an associate in the law firm of Katten Muchin Rosenman LLP, counsel of record for defendant Allied Interstate, LLC (Allied"). I make this declaration in support of Allied's Opposition to Plaintiff's Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth herein which I know to be true and correct and, if called as a witness, I could and would competently testify with respect thereto.

2.     On August 19, 2019, I appeared at the offices of Katten Muchin Rosenman, LLP, 100 Spectrum Center Drive, Suite 1050, Irvine, California 92618, where I participated in the deposition of plaintiff, Henry Mendoza, before a duly authorized court reporter. Attached as Exhibit A to this declaration are true and correct copies of relevant excerpts from the deposition of Mr. Mendoza as identified in Allied's Statement of Genuine Disputes Pursuant to Local Rule 56-3 served concurrently with this declaration.

3.     On or about April 23, 2018, Allied served written discovery in this action on the Plaintiff consisting of interrogatories, requests for admissions, and requests for production. True and correct copies of the interrogatories served on Plaintiff are attached hereto as Exhibit B.

4.     On or about June 10, 2018, Plaintiff served responses to the interrogatories (set one) and the requests for admissions (set one). Attached as Exhibit C to this declaration are true and correct copies of relevant excerpts from Plaintiff's discovery responses as identified in Allied's Statement of Genuine Disputes Pursuant to Local Rule 56-3 served concurrently with this declaration. With regard to Response to Interrogatory No. 9, Plaintiff stated that he would "supplement this response upon further discovery." Plaintiff never supplemented this response.

5. Plaintiff submitted two audio recordings with his Motion for Partial Summary Judgment as Exhibit D. I have listened to both of these recordings. I caused the recordings to be transcribed by the word processing department at Katten Muchin Rosenman LLP. I listened to the recordings and compared them to the transcriptions. The transcriptions accurately reflect the statements made on each of the calls. Attached hereto as Exhibit D is a true and accurate transcript of the first call. Attached hereto as Exhibit E is a true and accurate transcript of the second call.

6. At Plaintiff's deposition, Plaintiff's settlement agreement with Synchrony Bank was marked as Exhibit No. 4. A true and correct copy of this exhibit as it was introduced at the deposition is attached hereto as Exhibit F. Plaintiff refers to this settlement agreement at No. 28 of his Statement of Uncontroverted Facts.

I declare under penalty of perjury of the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed on September 30, 2019.

Paul A. Grammatico

## CERTIFICATE OF SERVICE

*Henry Mendoza v. Allied Interstate, LLC and Synchrony Bank*

Case No: 8:17-cv-00885-JVS-KES

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Katten Muchin Rosenman LLP, 515 S. Flower Street, Suite 1000, Los Angeles, CA 90071. On September 30, 2019, I served the foregoing documents described as:

## DECLARATION OF PAUL A. GRAMMATICO IN SUPPORT OF ALLIED INTERSTATE, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

| X | I electronically filed the foregoing document using the CM/ECF system which automatically sends notification of such filing to all counsel of record and or parties in this case. |
|---|---|
| | BY ELECTRONIC MAIL.   A PDF copy of the foregoing document was transmitted on this date via electronic mail to the address(es) listed below:<br><br>tegan@pricelawgroup.com<br>alla@pricelawgroup.com<br>prosen@jamsadr.com<br>ewu@jamsadr.com |
| | **BY U.S. MAIL.**  I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business to the address listed below:<br><br>Lauren Tegan Rodkey  Alla Gulchina, Esq.<br>Price Law Group APC  Price Law Group, APC<br>6345 Balboa Boulevard Suite 247  86 Hudson Street<br>Encino, CA 91316  Hoboken, NJ 07030<br>818-600-5526  T: (818) 600-5566<br>Fax: 818-600-5426  F: (818) 600-5466 |

I declare that I am employed in the office of a member of the bar of this Court and whose direction the service was made.

Executed on September 30, 2019, at Los Angeles, California.

Lora Anderson

# EXHIBIT A



Kelli Norden and Associates
Court Reporters
310.820.7755 phone  310.820.7955 fax
11855 W. Olympic Boulevard  Suite 680E
Los Angeles, California 90064
kna@kellinorden.com  www.kellinorden.com

In the Matter Of:

MENDOZA

vs

ALLIED

# HENRY MENDOZA

August 19, 2019

Case No: 8:17-CV-00885-JVS-KES

DEPOSITION OF HENRY MENDOZA

```
1                   UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4

5     HENRY MENDOZA,                    )
                                        )
6                     Plaintiff,        )
                                        )  Case No.
7          vs.                          )  8:17-CV-00885-JVS-KES
                                        )
8     ALLIED INTERSTATE, LLC,           )
                                        )
9                     Defendant.        )
      _____)

10

11

12

13                   (Pages 1 - 31 and 53 - 158)

14

15

16                        DEPOSITION OF:

17                        HENRY MENDOZA

18                    Monday, August 19, 2019

19

20

21

22

23    Reported by:

24    J'ana Chaudhry          CERTIFIED COPY
      CSR No. 10845
25
```

Kelli Norden And Associates, A Regal Corporation          1
310.820.7733  |  www.kellinorden.com  |  FAX: 310.820.7933

DEPOSITION OF HENRY MENDOZA

```
 1   the outset:  At times, your counsel may pose an
 2   objection to the question that I'm asking.  You're
 3   still -- you still have to answer the question unless
 4   he specifically instructs you not to answer it.
 5           Do you understand that?
 6       A.   Yes.
 7       Q.   So he may object to the form of the question
 8   or some other reason, but you're still under an
 9   obligation to answer the question.  Understood?
10       A.   Understood.
11       Q.   Okay.  All right.  Other than your wife and
12   your attorneys, have you talked to anyone else about
13   this lawsuit?
14       A.   No.
15       Q.   Okay.  Now, one of the other defendants in the
16   case is Synchrony.  And as I understand it, the case at
17   one time was an arbitration against Synchrony Bank, and
18   that arbitration was resolved; is that correct?
19       A.   Correct.
20       Q.   How was that resolved?
21       A.   Well, it should have on file whatever the
22   information.  I don't recall exactly what happened, I
23   mean, in detail, but it was resolved and it was
24   settled.
25       Q.   Okay.  And you signed a settlement agreement
```

DEPOSITION OF HENRY MENDOZA

```
 1    in connection with that?
 2         A.   Correct.
 3         Q.   Okay.  In the arbitration with Synchrony, did
 4    you give a deposition like this?
 5         A.   No, not in person.
 6         Q.   Not in person.  Did you give a different type
 7    of deposition?
 8         A.   I don't -- I don't remember.  I don't think
 9    so.
10         Q.   Okay.
11         A.   No.
12         Q.   All right.  So we'll come back to that.
13              All right.  I'm going to have -- I'm going to
14    mark this item as Exhibit 1.
15              (Whereupon, Defendant's Exhibit 1 was
16              marked for identification.)
17    BY MR. GRAMMATICO:
18         Q.   For the record, Exhibit 1 is titled "Amended
19    Notice of Deposition of Plaintiff and Request for
20    Production of Documents."
21              Mr. Mendoza, have you seen this document
22    before?
23              (Document reviewed by the deponent.)
24              THE DEPONENT:  Yes, I believe so.
25    / / /
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1   BY MR. GRAMMATICO:
 2       Q.   Mr. Mendoza, now, earlier you testified that
 3   your arbitration with Synchrony was resolved via a
 4   settlement agreement; correct?
 5           MR. HAMMOUD: Objection; asked and answered.
 6           You can answer.
 7           THE DEPONENT:  Yes.
 8   BY MR. GRAMMATICO:
 9       Q.   Before you, marked as Exhibit 4, is a document
10   entitled "Confidential Settlement Agreement."  Is this
11   that settlement agreement?
12           MR. HAMMOUD:  Objection; the document speaks
13   for itself.
14           You can answer.
15           THE DEPONENT:  Yes.
16   BY MR. GRAMMATICO:
17       Q.   Okay.  Now, I'd like to ask you about the --
18   let's see.  So first you can turn to page 8.  So on
19   page 8, is -- there's a date there.  It says December
20   17, 2018, and then there's a signature block, and it
21   has your name printed there, and there's a signature
22   there.  Do you see that?
23       A.   Yes.
24       Q.   Is that your signature?
25       A.   Yes.
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1        Q.   Okay.  Now, I'd like you to look at the
 2   "Recitals" section, which is on page 1.
 3             Do you see that?
 4        A.   Yes.
 5        Q.   Okay.  And in the "Recitals" section -- you
 6   might want to just read it.
 7             (Document reviewed by the deponent.)
 8   BY MR. GRAMMATICO:
 9        Q.   Have you read it before?
10        A.   Yes.
11        Q.   Now, in the "Recitals" section, it references
12   five separate credit card accounts, and those credit
13   card accounts are -- there's two JCPenney accounts,
14   there's a Walmart account, there's a PayPal account,
15   and there's a TJX account.
16             Do you see that?
17        A.   Yes.
18        Q.   So here's one of my questions:  Why did you
19   have so many credit cards?
20        A.   For various reasons.  To purchase at different
21   stores.
22        Q.   And were the purchases for personal or
23   business use?
24        A.   Both.
25        Q.   Okay.  Now, which of these accounts are you --
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1    serve the basis of your lawsuit against Allied?
 2         A.    The Synchrony JCPenney accounts.
 3         Q.    The two JCPenney accounts; correct?
 4         A.    Correct.
 5         Q.    What about the other three accounts?
 6               MR. HAMMOUD:  Objection; asked and answered.
 7               You can answer.
 8               THE DEPONENT:  I'm not understanding the
 9    question.  What about the --
10    BY MR. GRAMMATICO:
11         Q.    I'm sorry.  I'll rephrase it.
12               So you just stated that the basis of your
13    lawsuit against Allied is the two JCPenney accounts;
14    correct?
15         A.    Correct.
16         Q.    Are you also suing Allied in connection with
17    the other three accounts?
18         A.    No.
19         Q.    Okay.  That was it.  Sorry.
20               Okay.  So you can take a look at Section 3,
21    which is on page 3, where it says "Obligations of
22    Synchrony."  Do you see that?
23         A.    Yes.
24         Q.    Okay.  And do you see part "a" where it says
25    "Settlement Payment"?
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1      A.   Yes.
 2      Q.   Have you read this section before?
 3      A.   Yes.
 4      Q.   Now, in connection with your settlement with
 5  Synchrony, were you paid 22,016 dollars and 62 cents?
 6           MR. HAMMOUD:  Objection; the document speaks
 7  for itself.
 8                Don't answer that.
 9           MR. GRAMMATICO:  Are you specifically
10  instructing the witness not to answer that question?
11           MR. HAMMOUD:  Yes.  The document speaks for
12  itself.
13           MR. GRAMMATICO:  Okay.  That's --
14           MR. HAMMOUD:  If you want him to read off the
15  document, that's fine.
16           MR. GRAMMATICO:  Okay.  Then you don't need to
17  instruct him not to answer it.  I mean, in other words,
18  I'm not objecting to your objection, I'm just asking if
19  you're instructing him not to answer it.
20                Court reporter, can you please repeat my
21  question.
22                (The record was read as follows:
23                Q.   Now, in connection with your
24                settlement with Synchrony, were you
25                paid 22,016 dollars and 62 cents?)
```

Kelli Norden And Associates, A Regal Corporation      42
310.820.7733  |  www.kellinorden.com  |  FAX: 310.820.7933

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1          MR. HAMMOUD:  Objection; the document speaks
 2   for itself.
 3          MR. GRAMMATICO:  Your objection is noted.
 4   BY MR. GRAMMATICO:
 5      Q.   You can answer.
 6      A.   It does speak for itself.  I don't understand
 7   if you're -- you're asking me a question directly, if
 8   that's what --
 9      Q.   I'm asking if you were -- this document says
10   you were paid 22,016 dollars and 62 cents in connection
11   with the settlement agreement.  Is that true or false?
12      A.   True.
13      Q.   So you were, in fact, paid that amount of
14   money?
15          MR. HAMMOUD:  Objection; asked and answered
16   and the document speaks for itself.
17   BY MR. GRAMMATICO:
18      Q.   You can answer.
19      A.   True.
20      Q.   Okay.  Thank you.
21          Okay.  Look at Section 3.b.  Do you see that,
22   where it says "Account Credits and Account Closure"?
23      A.   Yes.
24      Q.   And now under that heading, there's a
25   Section i and -- there's a section little "i" and then
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1   under seal.  Is that acceptable?
 2            MR. HAMMOUD:  Okay.
 3            MR. GRAMMATICO:  And also, like I said,
 4   there's a particular provision in the protective order,
 5   once you see the transcript, you can designate it as
 6   such.
 7            All right.  Was there a question pending?
 8            MR. HAMMOUD:  I believe you were talking
 9   about --
10            (Whereupon, a discussion was held
11            off the record.)
12   BY MR. GRAMMATICO:
13       Q.   So little "i" says:
14                "Synchrony will apply an
15            account credit of 1,043 dollars and
16            52 cents to Claimant's 3032 JCP
17            account."
18            Do you see where it says that, Mr. Mendoza?
19            MR. HAMMOUD:  Objection; the document speaks
20   for itself.
21            THE DEPONENT:  Yes.
22   BY MR. GRAMMATICO:
23       Q.   And did Synchrony apply that particular
24   credit?
25            MR. HAMMOUD:  Objection; the document speaks
```

CONFIDENTIAL DEPOSITION OF HENRY MENDOZA

```
 1    for itself.
 2              THE DEPONENT:  I believe so.
 3    BY MR. GRAMMATICO:
 4        Q.   Okay.  And now look at little heading -- two
 5    little i's.  That heading -- I'm going to read it off
 6    the document.  It says:
 7                  "Synchrony will apply an
 8              account credit of 2,822 dollars and
 9              53 cents to Claimant's 9002 JCP
10              account."
11              Do you see where it says that?
12              MR. HAMMOUD:  Objection; the document speaks
13    for itself.
14              THE DEPONENT:  Yes.
15    BY MR. GRAMMATICO:
16        Q.   And did Synchrony apply that particular
17    credit?
18        A.   I believe so.
19        Q.   Okay.  Now, going back to little "i," look at
20    the very last sentence.  I'll read it.  It says:
21                  "If this credit reduces the
22              account to a zero balance, the
23              account will be closed."
24              Do you see that?
25        A.   Yes.
```

DEPOSITION OF HENRY MENDOZA

1          THE DEPONENT:  If it states on there, I
2    believe so.
3    BY MR. GRAMMATICO:
4        Q.   Okay.  When did this account become
5    delinquent?
6        A.   You want a specific time frame?  Year?  I can
7    give you a year.
8        Q.   I'd like you to be as specific as you can be
9    without guessing.
10       A.   2015, 2016.  The end of 2015, beginning of
11   2016.
12       Q.   Okay.  And did you receive collection calls on
13   this account?
14       A.   Yes.
15       Q.   And who made those collection calls?
16       A.   I believe from that particular store, you
17   know, creditor.  I don't know if it was a direct call
18   or -- unless they stated it was once I answered.
19       Q.   Okay.  So I guess my question is:  Do you know
20   if it was one entity or multiple entities?
21       A.   I can say I believe it's one, but it depends,
22   because I know how -- once -- I believe it's one, a
23   whole -- so I don't know who it is, but I'm sure it's
24   from the company that represents that firm trying to
25   collect.

DEPOSITION OF HENRY MENDOZA

```
1       Q.   Okay.  Do you recall when you received those
2   collection calls?
3       A.   In that period of time, without looking at the
4   call log or anything like that, no.  I would have to --
5   I know I received them.
6       Q.   Do you know how many you received?
7       A.   Not many.
8       Q.   Not many?
9       A.   Not many compared to...
10      Q.   Not many -- go ahead.  Finish your sentence.
11      A.   Not many compared to what I'm -- the complaint
12  is about.
13      Q.   Okay.  And do you know how many it was?
14      A.   I would assume a few, every other day, if
15  that.
16      Q.   Okay.  And do you know when the calls started?
17      A.   Can you repeat it?
18      Q.   Do you know when the collection calls on the
19  Walmart account started?
20      A.   Again, same thing, in that period of time, end
21  of '15, '16.
22      Q.   Do you know how long the calls went on for?
23      A.   I believe a few months as well.
24      Q.   Okay.
25           All right.  I'm going to have the court
```

DEPOSITION OF HENRY MENDOZA

1    reporter mark this document as Exhibit Number 6.
2              (Whereupon, Defendant's Exhibit 6 was
3              marked for identification.)
4    BY MR. GRAMMATICO:
5         Q.   For the record, this document is from CIR Law
6    Offices International.  It's dated May 9th, 2016.  It
7    refers to the creditor as Synchrony Bank, and the re
8    line says "Walmart Credit Card."
9              Mr. Mendoza, have you seen this letter before?
10        A.   Yes.
11        Q.   And I'll submit to you that this is also one
12   of the documents that you produced in discovery.  Were
13   you aware of that?
14        A.   Yes.
15        Q.   Okay.  When is the first time you read this
16   letter?
17        A.   Must have been about -- in May, when it was
18   sent out to me.
19        Q.   So approximately May 9th, 2016?
20        A.   Around that time.
21        Q.   Did you respond to the letter?
22        A.   No.
23        Q.   And is it your belief that you received the
24   letter approximately May 9th, 2016?
25             MR. HAMMOUD:  Objection; the document speaks

DEPOSITION OF HENRY MENDOZA

```
 1    for itself.
 2              THE DEPONENT:  Yes, around that time.
 3              MR. GRAMMATICO:  I don't think it speaks to
 4    when he received it; right?  That's just the date.
 5              MR. HAMMOUD:  I put my objection on file, and
 6    then you continue; right?
 7              MR. GRAMMATICO:  No, I understand.  I'm just
 8    pointing that out.
 9    BY MR. GRAMMATICO:
10        Q.   Okay.  So let's just go through the letter
11    quickly.  If you look at the second sentence in the
12    body of the letter, it says:
13                   "Our client claims that you
14              have a delinquent balance as stated
15              above.  Unless you notify this
16              office within 30 days after
17              receiving this notice that you
18              dispute the validity of this debt
19              or any portion thereof, this office
20              will assume this debt is valid."
21              Do you see that?
22        A.   Yes.
23        Q.   And did you respond to the letter and dispute
24    the debt -- I'm sorry.  I'm going to ask a better
25    question.
```

DEPOSITION OF HENRY MENDOZA

1            You earlier testified that you did not respond
2    to the letter; correct?
3        A.   Correct.
4        Q.   All right.  Now, the letter is essentially
5    claiming that you're delinquent on this particular
6    credit card.  Were you delinquent on this card?
7        A.   Yes.
8        Q.   And -- all right.  Now, you'll notice that the
9    letter is from a debt collector.  It's from a
10   third-party, which is CIR Law Offices International.
11           Do you see that?
12       A.   Yes.
13       Q.   Did this particular company make
14   debt-collection calls to you?
15       A.   I couldn't tell you for certain.
16       Q.   You could not -- I'm sorry.
17       A.   I could not tell you for certain.
18       Q.   You could not tell me for certain?
19       A.   Yeah.
20       Q.   Okay.  Why can't you?
21       A.   I'm not quite sure.  If they actually left
22   messages, then I believe they -- if they left messages
23   and they're on the phone, then yes.  But if they didn't
24   leave any messages and they called, I wouldn't be able
25   to tell you.

DEPOSITION OF HENRY MENDOZA

1      Q.   Well, you would be able to tell from looking
2   at your phone records, wouldn't you?
3      A.   If the number would come up.  Sometimes I
4   would have numbers that don't come up.  Some of them
5   would leave messages, some of them would not.  Some of
6   them were automated, some of them were not, so...
7      Q.   So you're saying that sometimes the number
8   wouldn't show up on your phone when they called?
9      A.   Sometimes, yes.
10     Q.   With regard to this particular debt
11  collector -- right? -- CIR Law Offices International,
12  do you recall ever speaking on the phone with this debt
13  collector?
14     A.   No, I do not.
15     Q.   Other than this particular letter, are you
16  aware of any other communications you've had with this
17  particular debt collector?
18     A.   Well, unless they called -- I'm not sure if
19  that would be considered communication -- and it wasn't
20  answered.
21     Q.   Well, I guess when I say "communications" I
22  mean -- you said earlier that you don't have any
23  recollection of speaking on the phone with these
24  people; correct?
25     A.   Correct.

DEPOSITION OF HENRY MENDOZA

```
 1        Q.   And was there any other type of
 2   correspondence?  For instance, did you write a letter
 3   to them?
 4        A.   No, I did not write a letter.
 5        Q.   All right.  That's what I was talking about
 6   when I meant other communications.  I meant other than
 7   on the phone.  Would you have communicated with them in
 8   some other way?
 9        A.   I understand.  No.
10        Q.   Okay.  All right.  Do you remember ever
11   speaking on the phone with Synchrony regarding this
12   particular account?
13        A.   Yes.
14        Q.   How many times do you remember speaking on the
15   phone with Synchrony about this account?
16        A.   At least two times.
17        Q.   At least two times?
18        A.   Around -- yeah, at least two times.
19        Q.   And do you know the dates of those calls?
20        A.   I can't remember the date, no, unless I look
21   at my records and...
22        Q.   Okay.  Let's take the first call.  What do you
23   remember about the first call when you spoke with
24   Synchrony about this account?
25        A.   First call was -- I think it was just them to
```

DEPOSITION OF HENRY MENDOZA

1  BY MR. GRAMMATICO:

2      Q.    Okay.  So we're done talking about the Walmart

3  account for now, so we're going to go to now one of the

4  other credit accounts which was referenced in the

5  settlement agreement with Synchrony, which is the

6  JCPenney account ending in 9002.  Do you recall that

7  account?

8      A.    Yes.

9      Q.    Okay.  And there's two JCPenney accounts;

10  right?  There's one ending in 9002 and one ending in

11  3032; correct?

12      A.    Correct.

13      Q.    All right.  So the one we're going to talk

14  about first is the one ending in 9002.  When was this

15  account opened?

16      A.    I'd have to look at my records.

17      Q.    In your discovery responses, you indicated

18  that you believe it was February of 2011.  Does that

19  sound correct?

20      A.    Yes.

21      Q.    All right.  Is it still open?

22      A.    No.

23      Q.    When was it closed?

24      A.    Again, by my records, whatever I have on

25  there.

DEPOSITION OF HENRY MENDOZA

1          THE DEPONENT:  I don't remember if I even
2   covered that area, so I may or may not give consent if
3   I didn't -- if I didn't cover it, so I can't give you
4   the honest truth.  I don't know.  I don't remember.
5   BY MR. GRAMMATICO:
6       Q.   When did this account become delinquent?
7       A.   Again, what I have on file would be the more
8   accurate description of when it was delinquent.
9       Q.   But you haven't provided any information to me
10  that would indicate that, so do you -- I guess I'm just
11  asking you from your memory.  Do you know when this
12  account became delinquent?
13      A.   No.
14      Q.   But the account is no longer open; correct?
15      A.   I believe it's not open anymore.
16      Q.   Okay.  And did you receive collection calls on
17  this account?
18      A.   Yes.
19      Q.   And from whom did you receive collection
20  calls?
21      A.   I believe both the -- from Synchrony and from
22  Allied.
23      Q.   Other than Synchrony and Allied, did you
24  receive calls from any other entity regarding this
25  account?

DEPOSITION OF HENRY MENDOZA

```
 1        A.    It might have been from the -- I'm not sure if
 2    it's from the store itself, because they do if you're
 3    late.  I believe I got maybe a call or two to remind me
 4    of -- they haven't received payment or something like
 5    that.
 6        Q.    So when you say "the store," you're saying
 7    that you think JCPenney may have called you?
 8        A.    Might, yeah.
 9        Q.    Do you recall specifically any of those
10    conversations?
11        A.    No, no.  Just -- I do remember someone leaving
12    a message that -- about my card.
13        Q.    So JCPenney called you and left a message
14    saying you were delinquent on the account?
15        A.    I believe so.
16        Q.    Do you know when that call was?
17        A.    No.
18        Q.    Do you know how many such calls like that you
19    received?
20        A.    Not much.  Again, it was one of those calls I
21    don't really get, so...
22        Q.    Do you know when you started receiving calls
23    from Synchrony on the account?
24        A.    No.
25        Q.    Do you know when the calls from Synchrony
```

DEPOSITION OF HENRY MENDOZA

```
 1   stopped?
 2       A.   No.  Just what I have on file.
 3       Q.   Okay.  Let's go to Exhibit 8, moving right
 4   along here.
 5            I'll have the reporter mark this letter as
 6   Exhibit 8.
 7            (Whereupon, Defendant's Exhibit 8 was
 8            marked for identification.)
 9   BY MR. GRAMMATICO:
10       Q.   For the record, this document that we're going
11   to call Exhibit 8, this one was produced by you in
12   discovery last Friday.
13            And it says at the top in bold "Account Number
14   Ending In, colon, 9002."  And it appears to be from
15   Synchrony Bank, and it's dated June 14th, 2016.  And in
16   the top right corner it says "JCPenney Credit Card."
17            Mr. Mendoza, have you seen this letter before?
18       A.   Yes.
19       Q.   And the date at the top, June 14, 2016, is
20   that when you received this letter?
21       A.   I believe so.
22       Q.   What is this letter?
23       A.   It's an attempt to collect from a debt I had
24   or I have, and they're trying to communicate to me.
25       Q.   Well, you no longer have the debt because this
```

DEPOSITION OF HENRY MENDOZA

```
 1   account is closed; correct?
 2        A.   Correct.
 3        Q.   But as of June 14, 2016, this account was in
 4   default; correct?
 5        A.   Correct.
 6        Q.   Did you respond to this letter?
 7        A.   No.
 8        Q.   Did you take any action in regard to this
 9   account after you got this letter?
10        A.   I'm not sure how -- can you rephrase that,
11   please?
12        Q.   Yeah.  I guess I'm saying -- so you said that
13   you didn't call them after you received this letter;
14   right?
15        A.   Correct.
16        Q.   Did you take any other action?  For instance,
17   did you make a payment?  Did you try to cure the
18   default on the account?
19        A.   I'm not sure if I tried to make a payment.
20   I'm not sure of that.
21        Q.   Okay.  Let's look at the second paragraph.
22   I'm going to read the second paragraph to you.  Okay?
23                  "According to our records, you
24              opened your JCPenney credit account
25              on 2-28-2011.  You did so by
```

DEPOSITION OF HENRY MENDOZA

1              signing the application, whether

2              written, verbally or

3              electronically, and agreeing that

4              you understood the terms and

5              conditions of the account.

6                   "You entered into a valid

7              agreement with Synchrony Bank and

8              JCPenney credit card upon signing

9              the application, whether written,

10             verbally or electronically, and

11             subsequently each time you

12             authorized a transaction on your

13             account."

14             Do you see where it says that?

15     A.     Yes.

16     Q.     Is it your understanding that any part of that

17   paragraph is inaccurate?

18     A.     No.

19     Q.     Okay.  Why did you not attempt to cure the

20   default on this account?

21     A.     I couldn't financially.

22     Q.     Okay.  So I'm wondering -- you haven't

23   actually produced the credit card application for this

24   account.  Is there any reason why you have not produced

25   it?

DEPOSITION OF HENRY MENDOZA

```
 1                    "You also consent to us and
 2              any other owner or servicer of your
 3              account contacting you using any
 4              communication channel.  This may
 5              include text messages, automatic
 6              telephone dialing systems and/or an
 7              artificial or prerecorded voice.
 8              This consent applies even if you
 9              are charged for the call under your
10              plan."
11              Have you read that particular provision before
12    in this agreement?
13         A.   I don't remember on this agreement.
14         Q.   Okay.  When did you become delinquent on this
15    account?
16         A.   Whatever is on my -- on my forms there.  I
17    don't recall exactly when it was.
18         Q.   Do you recall approximately when it was?
19         A.   Whatever it states.  I don't remember.
20         Q.   Whatever it states on what?  I don't have
21    anything to indicate to me when you became delinquent
22    on it.
23         A.   Then I don't remember.  I don't recall.
24    It's -- I don't recall.
25         Q.   Okay.  Did you receive collection calls on
```

DEPOSITION OF HENRY MENDOZA

1   this account?

2       A.   Yes.

3       Q.   And who made the collection calls?

4       A.   Well, first it was Synchrony, I believe.

5       Q.   Okay.  Anyone else?

6       A.   Then Allied.

7       Q.   Okay.  Anyone else?

8       A.   And I'm not sure if this one was also part of

9   the store, where they called.

10      Q.   So it's possible that JCPenney may have called

11  you on this account, as well, but you're not sure?

12      A.   Right, right.

13      Q.   All right.  Other than Synchrony, Allied and

14  possibly JCPenney, did anyone else call you in

15  connection with this account to collect a debt?

16      A.   I don't believe so.

17      Q.   Okay.  Do you remember when you started

18  receiving the collection calls?

19      A.   Once I was delinquent.

20      Q.   And you're unsure at this point when exactly

21  you became delinquent; correct?

22      A.   Correct.

23      Q.   Now, I'll stipulate that you haven't produced

24  the credit card application for this account.  Is that

25  because you've been unable to locate it?

DEPOSITION OF HENRY MENDOZA

1    see a provision there that says "Consent to
2    Communications."  Do you see that?
3        A.   Yes.
4        Q.   Have you read -- have you ever read that
5    particular provision?
6        A.   I might have glanced through it.  I don't
7    recall reading it.
8        Q.   Okay.  You don't recall reading that specific
9    provision?
10       A.   Correct.
11       Q.   All right.  When did this account become
12   delinquent?
13       A.   Again, with the other ones at that particular
14   time frame.
15       Q.   And what particular time frame was that?
16       A.   What you have on your record, if you have it.
17       Q.   Do you think this account was delinquent in
18   approximately April of 2016?
19       A.   Yes.
20       Q.   Was it delinquent in May of 2016?
21       A.   Yes.
22       Q.   Was it delinquent in June of 2016?
23       A.   I believe so.
24       Q.   All right.  Did you receive collection calls
25   in connection with the PayPal account?

DEPOSITION OF HENRY MENDOZA

```
1        A.    Yes.
2        Q.    From whom?
3        A.    Synchrony.
4        Q.    Okay.  Anyone other than Synchrony?
5        A.    I can't be quite sure.  Whatever I have on
6    there.  I'm not sure what other ones.
7        Q.    Whatever you have on where?
8        A.    On my records that you guys have.
9        Q.    You're going to need to be more specific.
10       A.    Oh, no, I don't recall.
11       Q.    Okay.  So, I mean, just -- as you testified
12   today, you recall only for sure that you received
13   collection calls from Synchrony Bank; correct?
14       A.    Correct.
15       Q.    With regard to the account we're talking
16   about?
17       A.    Yes.
18       Q.    All right.  When did you start receiving those
19   collection calls?
20       A.    I don't recall.
21       Q.    All right.  Do you know how long those
22   collection calls went on for?
23       A.    Months.
24       Q.    How many months?
25       A.    Approximately two or three months.
```

DEPOSITION OF HENRY MENDOZA

```
1        Q.   Okay.  All right.
2             I have another document with regard to this
3   particular account, and I'll mark this as Exhibit 11.
4             (Whereupon, Defendant's Exhibit 11 was
5             marked for identification.)
6   BY MR. GRAMMATICO:
7        Q.   Mr. Mendoza, I'm going to state for the record
8   that this Exhibit 11 -- what we've marked as Exhibit 11
9   says at the top "Law Offices of Patenaude & Felix,
10  APC," and it's dated May 3rd, 2016.  And in the re
11  line, it refers to "Our Client:  Synchrony Bank."  And
12  the "Issued as" line has a colon, and it says
13  "PayPalExtras MasterCard."
14            And I'll stipulate that this is a document
15  that you produced to us in discovery last Friday.
16            Have you seen this letter before?
17       A.   Yes.
18       Q.   What is this letter?
19       A.   It's a letter asking basically for me to
20  contact them because it's been assigned to collection.
21       Q.   Okay.  It was assigned to Patenaude & Felix --
22       A.   Yes.
23       Q.   -- for collections?
24       A.   Yes.
25       Q.   And when you received this letter, did you
```

DEPOSITION OF HENRY MENDOZA

```
 1   contact Patenaude & Felix to make a payment?
 2        A.   No.
 3        Q.   Why not?
 4        A.   I don't recall why not.
 5        Q.   Okay.  Did you respond to this letter in any
 6   way?
 7        A.   No.
 8        Q.   Did you call Patenaude & Felix?
 9        A.   No.
10        Q.   All right.  The letter states, essentially,
11   that as of May 3rd, 2016, the PayPal account was in
12   default; is that accurate?
13        A.   Sounds accurate, yes.
14        Q.   Okay.  And now earlier, you testified that you
15   believe on the PayPal account you received collection
16   calls from Synchrony; is that right?
17        A.   Yes.
18        Q.   Did you also receive collection calls on this
19   account from Patenaude & Felix?
20        A.   I wouldn't have known because I didn't -- if I
21   would have remembered, I would, you know, tell you, but
22   I don't remember.
23        Q.   So you're not sure?
24        A.   Not sure.
25        Q.   Now, do you recall ever having a conversation
```

DEPOSITION OF HENRY MENDOZA

1    with anyone from this law office, Patenaude & Felix?

2        A.    No.

3        Q.    Other than this letter, are you aware of any

4    other correspondence from Patenaude & Felix?

5        A.    No.

6        Q.    And as you're sitting here today, you don't

7    remember ever talking with them?

8            MR. HAMMOUD:  Objection; asked and answered.

9            THE DEPONENT:  No.

10   BY MR. GRAMMATICO:

11       Q.    As of the date of this letter, were you

12   receiving collection calls from Synchrony?

13       A.    I believe so, but I'm not sure.

14       Q.    How many collection calls did you receive from

15   Synchrony?

16       A.    From Synchrony?

17       Q.    With regard to the PayPal account.

18       A.    I can't remember how much -- how many.

19       Q.    Did you answer any of them?

20       A.    I don't remember.  I may have or may have not.

21   I don't remember.

22       Q.    Do you ever -- do you remember having any

23   conversation with Synchrony on the phone regarding the

24   PayPal account?

25       A.    I don't remember.

DEPOSITION OF HENRY MENDOZA

```
1        Q.   Do you have any notes in your possession
2   regarding calls that you had in connection with the
3   PayPal account?
4        A.   I don't think so.
5        Q.   Do you remember speaking with anyone else on
6   the phone about this account, either Synchrony or
7   anyone?
8        A.   PayPal might have called, just like JCPenney,
9   to remind me about a -- I'm not quite sure, but I think
10  they might have called.
11       Q.   They may have?
12       A.   They may have called.
13       Q.   And do you recall speaking with anyone at
14  PayPal?
15       A.   No, I don't remember that conversation, if it
16  happened.
17       Q.   Do you recall if PayPal left any messages for
18  you?
19       A.   Yes.
20       Q.   Did you save any of those messages?
21       A.   I don't think so.  I don't remember.
22       Q.   Okay.  Because, I mean, that's also one of the
23  things that we've asked for --
24       A.   Right.
25       Q.   -- in discovery.
```

DEPOSITION OF HENRY MENDOZA

```
1              (Whereupon, Defendant's Exhibit 12 was
2              marked for identification.)
3    BY MR. GRAMMATICO:
4        Q.   For the record, the document that we have
5    marked as Exhibit 12 says "GE Capital Retail Bank" in
6    the top right corner, and then beneath that in bold it
7    says "Section I: Rates and Fees Table," and beneath
8    that, "TJX Rewards Platinum MasterCard Account
9    Agreement."
10             And I'll stipulate this is one of the
11   documents that you produced to us in discovery on
12   Friday.
13             Mr. Mendoza, have you seen this before?
14       A.   Yes, if I provided it, I believe I have seen
15   it.
16       Q.   What is this?
17       A.   The agreement of the card I opened up with
18   them.
19       Q.   The TJ Maxx card?
20       A.   Yes.
21       Q.   That's the TJ Maxx card that's referenced in
22   the settlement agreement with Synchrony; correct?
23       A.   Yes.
24       Q.   All right.  Have you read this agreement
25   before?
```

DEPOSITION OF HENRY MENDOZA

1    A.    Somewhat, again.  Some of them I might have
2  glanced over.
3    Q.    Okay.  And that would have been your typical
4  custom and practice, to glance through it but not read
5  it in its entirety; correct?
6    A.    At the store, correct.  If done at the store.
7    Q.    Okay.  Can you turn to the second page?
8    A.    Sure.
9    Q.    If you go down in the left-hand column -- I
10  know the writing is small -- the fourth gray bar from
11  the bottom says "Information About You," and the third
12  heading in bold under that says "Consent to
13  Communications."  Do you see that?
14    A.    Yes.
15    Q.    Have you ever read that provision before?
16    A.    Yes.
17    Q.    Did you read it when you opened your account?
18    A.    I don't remember if I did.
19    Q.    Did you consent to being contacted on your
20  cellular phone when you opened this account?
21    A.    Yes.
22    Q.    When did this account become delinquent?
23    A.    I don't recall.
24    Q.    Do you have an approximate date?
25    A.    No.

DEPOSITION OF HENRY MENDOZA

```
 1      Q.   Did you receive collection calls on this
 2   account?
 3      A.   Yes.
 4      Q.   From whom?
 5      A.   Synchrony.
 6      Q.   Other than Synchrony, did you receive
 7   collection calls from anyone else?
 8      A.   Not that I remember.  Just Synchrony.
 9      Q.   Okay.  Do you know when the collection calls
10   from Synchrony started?
11      A.   Once it was delinquent.  But I can't recall
12   the time frame.
13      Q.   Was it delinquent in April of 2016?
14      A.   Might have been.
15      Q.   Was it delinquent in May of 2016?
16      A.   Might have been.
17      Q.   Was it delinquent in June of 2016?
18      A.   It might have been.
19      Q.   How long did Synchrony make collection calls
20   on this account?
21      A.   I don't remember.
22      Q.   How many collection calls on this account did
23   Synchrony make?
24      A.   I don't remember.
25      Q.   Did you answer any of the calls?
```

DEPOSITION OF HENRY MENDOZA

1        A.    I don't recall if I did.
2        Q.    Did you take notes during any of the calls?
3        A.    I don't recall that I did on that one.
4        Q.    The TJ Maxx account?
5        A.    Yeah.
6        Q.    Do you recall any particular person that you
7   spoke with?
8        A.    No, I can't remember anything.
9        Q.    Now, earlier we've looked at -- some of the
10   prior exhibits, you'll recall, were debt-collection
11   letters from particular debt collectors regarding some
12   of the prior accounts we spoke with.
13          Do you recall ever receiving a debt-collection
14   letter like that on the TJ Maxx account?
15        A.    No, unless I turned it in or, you know -- I
16   don't remember.
17        Q.    Well, I can tell you that -- I can represent
18   that you didn't produce any such letters, so I guess my
19   question is:  Do you know if Synchrony referred this
20   particular account to a third-party debt collector?
21          MR. HAMMOUD:  Objection; calls for
22   speculation.
23          You can answer if you know.
24          THE DEPONENT:  I don't remember if -- I don't
25   know if they hired somebody or, you know, switched over

DEPOSITION OF HENRY MENDOZA

```
 1   when you opened the account?
 2        A.    I may have -- I may have gotten a pamphlet.
 3   I'm not sure if they approved me right away.
 4        Q.    Other than the pamphlet, do you recall
 5   receiving anything else?
 6        A.    When I opened it?
 7        Q.    Yes.
 8        A.    No.
 9        Q.    Okay.  Let's go back to Exhibit 13, which is
10   the collection letter.
11        A.    Yes.
12        Q.    The collection letter says:
13                  "As of the date of this
14              letter, you owe the above current
15              account balance.  Because of
16              interest and/or other charges that
17              may vary from day to day, the
18              amount due on the day you pay may
19              be greater."
20              Do you see where it says that?
21        A.    Yes.
22        Q.    Is it your understanding that this account was
23   delinquent on March 21st, 2016?
24        A.    Yes.
25        Q.    And when you received this letter, did you
```

DEPOSITION OF HENRY MENDOZA

```
 1   write a response to United Collection Bureau, Inc.?
 2        A.   No.
 3        Q.   Did you call United Collection Bureau, Inc.?
 4        A.   No.
 5        Q.   Did you make a payment to United Collection
 6   Bureau, Inc.?
 7        A.   I don't think so.
 8        Q.   Do you recall taking any other action in
 9   response to this letter?
10        A.   No.
11        Q.   Why did this account become delinquent?
12        A.   Financial hardship at that particular moment.
13        Q.   When was the financial hardship alleviated?
14        A.   Once -- I'm not sure how to answer that
15   because I don't think it has, in that particular
16   period.  Are you asking me from now till then, or was
17   it just -- can you --
18        Q.   Yeah, I'll ask again.
19             The way you answered your last question -- I
20   think the question was why had you become delinquent;
21   right?  And you said financial hardship.
22             So it sounded like you were suggesting to me
23   that it was an isolated, temporary financial hardship
24   which was later alleviated; right?
25             So is the financial hardship still going on
```

DEPOSITION OF HENRY MENDOZA

1    or --

2         A.   Yes.

3         Q.   It is ongoing?

4         A.   Somewhat.  Not -- never to the point I was

5    prior to all that.

6         Q.   Okay.  When did the financial hardship begin?

7         A.   When I became delinquent and...

8         Q.   I guess I'm looking for a more specific date,

9    if you can provide it.

10        A.   I would have to check when -- I would have to

11   check when things got delinquent, because --

12        Q.   Well, this letter says March 21st, 2016, so do

13   you think it was before that?

14        A.   Yes.

15        Q.   So it would have been before this letter was

16   delinquent?

17        A.   Right.

18        Q.   So were you experiencing financial hardship in

19   April of 2016?

20        A.   Yes.

21        Q.   How about May of 2016?

22        A.   Yes.

23        Q.   How about June of 2016?

24        A.   Yes.

25        Q.   All right.  Now, the letter is from United

DEPOSITION OF HENRY MENDOZA

```
 1   Collection Bureau, Inc.  Do you recall any
 2   communications you had with that particular company?
 3        A.   No.
 4        Q.   Did you ever speak with them on the phone?
 5        A.   I don't believe so.
 6        Q.   Did they send any other letters to you?
 7        A.   I don't -- I don't remember on that.
 8        Q.   Okay.  Let's go to the next -- I'm going to
 9   show you another letter that they sent you two months
10   later.
11             (Whereupon, Defendant's Exhibit 14 was
12             marked for identification.)
13   BY MR. GRAMMATICO:
14        Q.   Take a quick look at that.  Let me know when
15   you're ready.
16             (Document reviewed by the deponent.)
17   BY MR. GRAMMATICO:
18        Q.   For the record, Exhibit 14 is purportedly from
19   United Collection Bureau, Inc.  It's dated May 17th,
20   2016.  The creditor says "Citibank NA," and it says
21   "Regarding: The Home Depot."
22             Are you ready to answer some questions about
23   this?
24        A.   Yes.
25        Q.   Okay.  And I'll stipulate that this is also
```

DEPOSITION OF HENRY MENDOZA

```
 1    one of the letters that you produced in discovery last
 2    Friday.
 3            Have you seen this letter before?
 4        A.   Yes.
 5        Q.   When's the first time you saw it?
 6        A.   Around that May 17 or May 21st time, because
 7    these both look a lot alike and they're from...
 8        Q.   So on May 17, 2016, you received the letter
 9    and you read it; correct?
10        A.   Around that time.
11        Q.   Okay.  Approximately?
12        A.   Approximately.
13        Q.   All right.  And --
14            MR. HAMMOUD:  Can I just say something?
15            MR. GRAMMATICO:  Yes.
16            MR. HAMMOUD:  Because I think there's some
17    confusion when you say "you received the letter on May
18    17th."  So from my understanding, normally these are
19    printed and sent out on this date, and then they are
20    received sometime thereafter.
21            MR. GRAMMATICO:  Right.
22            MR. HAMMOUD:  So just to --
23            MR. GRAMMATICO:  No, right.  And he did a good
24    job there.
25            MR. HAMMOUD:  He's mentioned it a few times,
```

DEPOSITION OF HENRY MENDOZA

1    but not every time, so just to clear it up.

2           MR. GRAMMATICO:  Right.  So we're saying, I

3    guess, approximately.

4           MR. HAMMOUD:  Around that time, yeah.

5           MR. GRAMMATICO:  My point is just clarifying

6    that he received it --

7           MR. HAMMOUD:  Okay.

8           MR. GRAMMATICO:  -- so...

9    BY MR. GRAMMATICO:

10      Q.   All right.  Did you respond to this letter

11   after you read it?

12      A.   No.

13      Q.   The letter states that as of May 17, 2016,

14   that the Citibank account was in default; is that

15   accurate?

16          MR. HAMMOUD:  Objection; the document speaks

17   for itself.

18          THE DEPONENT:  I believe so.

19   BY MR. GRAMMATICO:

20      Q.   Do you know when this account became

21   delinquent?

22      A.   Not the exact date.

23      Q.   Did you receive collection calls on this

24   account?

25          MR. HAMMOUD:  Objection; asked and answered.

DEPOSITION OF HENRY MENDOZA

```
1              MR. GRAMMATICO:  I have not asked him that.
2              MR. HAMMOUD:  You asked him when you gave him
3    the first letter on the Citibank card.
4              MR. GRAMMATICO:  Okay.  Well...
5    BY MR. GRAMMATICO:
6         Q.   Have you received collection calls on this
7    account?
8         A.   Yes.
9         Q.   From whom?
10        A.   I believe from Citibank.
11        Q.   Other than Citibank, anyone else?
12        A.   I don't remember if it was anybody else.
13        Q.   What about United Collections Bureau, Inc.?
14             MR. HAMMOUD:  Objection; asked and answered.
15             You can answer.
16             THE DEPONENT:  I can't be for sure on that if
17   I received calls from them.
18   BY MR. GRAMMATICO:
19        Q.   You can't be sure?
20        A.   Can't be sure.
21        Q.   But you can be sure that you received calls
22   from Citibank?
23        A.   Yes.
24        Q.   How many calls came from Citibank?
25        A.   I don't know the exact number.
```

DEPOSITION OF HENRY MENDOZA

```
 1        Q.    Do you know when they started?
 2        A.    Roughly around when it became delinquent.
 3        Q.    And when it became delinquent was
 4   approximately March of 2016?
 5              MR. HAMMOUD:  Objection; asked and answered.
 6              THE DEPONENT:  Roughly around that time.
 7   BY MR. GRAMMATICO:
 8        Q.    Do you know how long the collection calls went
 9   on for?
10        A.    No.
11        Q.    Do you know how many collection calls you
12   received?
13        A.    No.
14        Q.    Did you answer any of them?
15        A.    Yes.
16        Q.    And who did you speak with when you answered?
17              MR. HAMMOUD:  Objection; confusing and asked
18   and answered -- not asked and answered.  Strike that.
19   But it's just confusing because -- go ahead.  That's
20   fine.
21              I think you want to make it clearer.  He said
22   that he spoke to Citi, so are you referring just on
23   these calls who did he speak to, as in -- he said he
24   spoke to Citi, he doesn't remember anybody else.  Are
25   you --
```

DEPOSITION OF HENRY MENDOZA

```
1              MR. GRAMMATICO:  Can you read back my
2    question?
3              I don't think it was confusing.
4              (The record was read as follows:
5              Q.   And who did you speak with when
6              you answered?)
7              THE DEPONENT:  Citi.
8    BY MR. GRAMMATICO:
9         Q.   Citi?
10        A.   Yes.
11        Q.   Okay.  How many times did you speak to Citi?
12        A.   I don't recall.
13        Q.   Did you take any notes during those calls with
14   Citi?
15        A.   I don't remember.
16        Q.   What were the substance of those calls?
17        A.   To collect money from my -- from my card.
18        Q.   Were the agents friendly on the phone?
19        A.   I don't remember that.
20        Q.   Did the calls cause you stress?
21        A.   A little bit.
22        Q.   What was stressful about that?
23        A.   That I had to -- that I was -- I'm not quite
24   sure, but I know some of them might have been during my
25   work schedule, and anything that comes in when I'm
```

DEPOSITION OF HENRY MENDOZA

1   working, I have to jump from one to the other, and

2   that's -- that might have been stressful a little bit.

3       Q.   Do you have any -- you haven't produced any

4   credit card applications with regard to the Citibank

5   account.  Is that because you were unable to locate

6   them?

7       A.   Yes.

8       Q.   Do you have any cell records evidencing

9   calls -- collection calls on the Citibank account?

10      A.   If you haven't got any, I don't believe I have

11  any.

12      Q.   Now, I think you said earlier that there

13  was -- your understanding is there was only one

14  Citibank card; correct?

15      A.   Yes.

16      Q.   And was that a MasterCard?

17          MR. HAMMOUD:  Objection; asked and answered.

18          THE DEPONENT:  It was a Home Depot card.

19  BY MR. GRAMMATICO:

20      Q.   Okay.  All right.  I'm going to go to the next

21  exhibit here.  Do you want to take a break or are you

22  okay?

23          MR. HAMMOUD:  If he's okay, I'm okay.

24          THE DEPONENT:  I'm good.

25  / / /

DEPOSITION OF HENRY MENDOZA

1  ability to do the job and -- you know.

2     Q.   Okay.  So it sounds like most of the items

3  that you identified are concerned with some type of

4  emotional distress.

5     A.   Right.

6     Q.   Are there any damages you're seeking that are

7  not connected to emotional distress?

8     A.   I would say it would be somewhat loss of work

9  a little bit.

10    Q.   Okay.  When you say "loss of work," can you be

11 more specific?

12    A.   Well, time spent at work that I -- this caused

13 me to not be as productive.

14    Q.   Okay.  So loss of productivity at work?

15    A.   Yes.

16    Q.   And how were you able to document that loss of

17 productivity?

18    A.   Again, I do my own work, so it's very

19 difficult to do that other than my testimony.

20    Q.   It's very difficult to do what?

21    A.   To document how I felt -- when I felt a

22 certain way, of course I was going to lose the

23 productivity because I wasn't feeling well.

24    Q.   And what was causing you not to feel well?

25    A.   The pressure of the calls, the duration, the

DEPOSITION OF HENRY MENDOZA

1   volume of the calls, when it was happening.

2        Q.   Was Allied the only one calling you?

3             MR. HAMMOUD:  Objection; asked and answered.

4             THE DEPONENT:  No and yes.  Meaning yes, other

5   ones were calling me, but once every couple days, and

6   this one was a lot, so it was very...

7   BY MR. GRAMMATICO:

8        Q.   So Allied called more than the other

9   creditors?

10       A.   Yes.

11       Q.   How many other creditors were there?

12            MR. HAMMOUD:  Objection; asked and answered.

13            THE DEPONENT:  There was a few other ones at

14   that particular moment.

15   BY MR. GRAMMATICO:

16       Q.   Do you have any documentary evidence that

17   would support the loss of productivity you experienced

18   at work?

19       A.   No.  I could only go by months before and

20   after, of my income.

21       Q.   How do you know that your productivity at work

22   suffered?

23       A.   By me not feeling well and having to

24   reschedule.

25       Q.   Do you know when you weren't feeling well?

DEPOSITION OF HENRY MENDOZA

1                         CERTIFICATE

2                              OF

3            CERTIFIED SHORTHAND REPORTER

4                     *    *    *    *

5

6

7        The undersigned Certified Shorthand Reporter of

8    the State of California does hereby certify:

9        That the foregoing Deposition was taken before

10   me at the time and place therein set forth, at which

11   time the Witness was duly sworn by me.

12       That the testimony of the Witness and all

13   objections made at the time of the Deposition were

14   recorded stenographically by me and were thereafter

15   transcribed, said transcript being a true and correct

16   copy of the proceedings thereof.

17       In witness whereof, I have subscribed my name,

18   this date:  August 22, 2019

19

20

21

22       _____

23            J'ANA CHAUDHRY, CSR No. 10845

24

25

# EXHIBIT B

1  Stuart M. Richter (CA 126231)
   stuart.richter@kattenlaw.com
2  Gregory S. Korman (CA 216931)
   gregory.korman@kattenlaw.com
3  Paul A. Grammatico (CA 246380)
   paul.grammatico@kattenlaw.com
4  **KATTEN MUCHIN ROSENMAN LLP**
   515 S. Flower St., Suite 1000
5  Los Angeles, CA 90071-2212
   Telephone:   213.443.9017
6  Facsimile:   213.443.9001

7  Attorneys for defendant, Allied Interstate LLC

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10 HENRY MENDOZA                    )  Case No.  8:17-CV-00885-JVS-KES
11                                  )  Hon. James V. Selna
          Plaintiff(s),            )
12                                  )
   v.                               )  **Defendant, Allied Interstate LLC's**
13                                  )  **Interrogatories to Plaintiff (Set One)**
   ALLIED INTERSTATE, LLC           )
14                                  )
          Defendant(s).            )  Complaint Filed:   May 19, 2017
15                                  )  Trial Date:        December 10, 2019
                                    )
16                                  )
17                                  )
                                    )
18

19

20

21

22

23

24

25

26

27

28

1 | PROPOUNDING PARTY:    Allied Interstate, LLC

2 | RESPONDING PARTY:    Henry Mendoza

3 | SET NO.:    One

4 |     Pursuant to Federal Rule of Civil Procedure 33, defendant, Allied Interstate LLC,

5 | Inc. ("Allied"), hereby requests that plaintiff, Henry Mendoza ("Plaintiff"), answer the

6 | following interrogatories fully, separately and under oath within thirty (30) days of service

7 | thereof.

8 | **INTERROGATORIES**

9 | **INTERROGATORY NO. 1:**

10 |     For each response to the Requests for Admissions served concurrently with these

11 | responses that was not an unqualified admission, state all facts upon which you base each

12 | response.

13 | **INTERROGATORY NO. 2:**

14 |     Describe each and every communication that you had with Allied, including the

15 | date, time, and substance of each communication, and your physical location at the time

16 | of each communication.

17 | **INTERROGATORY NO. 3:**

18 |     Describe each and every communication that you had with any debt collector

19 | regarding the two JC Penney accounts (3032 and 9002) that are the subject of this

20 | lawsuit, including the date, time, and substance of each communication, and your

21 | physical location at the time of each communication.

22 | **INTERROGATORY NO. 4:**

23 |     When (meaning, please provide as specific a date as possible) were the two JC

24 | Penney accounts (3032 and 9002) that are the subject of this lawsuit opened?

25 | **INTERROGATORY NO. 5:**

26 |     When (meaning, please provide as specific a date as possible) did you become

27 | delinquent on the two JC Penney accounts (3032 and 9002) that are the subject of this

28 | lawsuit?

Katten<br>KattenMuchinRosenman LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067-3012<br>310.788.4400 tel   310.788.4471 fax

1    **INTERROGATORY NO. 6:**

2        Why did you become delinquent on the two JC Penney accounts (3032 and 9002)

3    that are the subject of this lawsuit?

4    **INTERROGATORY NO. 7:**

5        When (meaning, please provide as specific a date as possible) did any collection

6    activity whatsoever, either by Synchrony Bank or another debt collector, begin against

7    you with regard to the two JC Penney accounts (3032 and 9002) that are the subject of

8    this lawsuit?

9    **INTERROGATORY NO. 8:**

10       When (meaning, please provide as specific a date as possible) did you receive the

11   first collection call with regard to the two JC Penney accounts (3032 and 9002) that are

12   the subject of this lawsuit?

13   **INTERROGATORY NO. 9:**

14       Describe all evidence you have regarding your contention that Allied was aware of

15   any revocation of consent with regard to the two JC Penney accounts (3032 and 9002)

16   that are the subject of this lawsuit.

17   **INTERROGATORY NO. 10:**

18       State every cellular phone number you contend that Allied called for which you

19   seek recovery in this case.

20   **INTERROGATORY NO. 11:**

21       Identify every person who has knowledge regarding the claims contained in the

22   Complaint and provide a brief description of the substance of his/her knowledge.

23   **INTERROGATORY NO. 12:**

24       State the date(s) that you requested that Allied cease telephone calls to your cell

25   phone, the name of the representative that you spoke with, and the date(s) of all

26   subsequent telephone calls.

27

28

1 **INTERROGATORY NO. 13:**

2      If you contend that at any point you revoked consent for Allied to call you on your

3 cellular phone, state when you revoked consent, how you revoked consent, and to whom

4 you revoked consent.

5 **INTERROGATORY NO. 14:**

6      Identify all other lawsuits and court proceedings, including bankruptcy

7 proceedings, in which you are or were a party, including for each suit the case number,

8 the name of the court, the style of the case, and the subject matter of the case.

9 **INTERROGATORY NO. 15:**

10      Identify all collection accounts for which you have been contacted by a collection

11 agency or creditor for the past five (5) years.

12 **INTERROGATORY NO. 16:**

13      Describe the factual basis and amounts of all damages you sustained as a result of

14 Allied's conduct.

15 **INTERROGATORY NO. 17:**

16      Identify any calendars, diaries, logs, notes, journals, or any other written or

17 recorded summary of events maintained by you that in any way relate to this Complaint.

18 **INTERROGATORY NO. 18:**

19      State when you first obtained telephone service at each cellular number you claim

20 was being called by Allied; the service provider; the subscriber for the service; the identity

21 of all authorized users; and the identity of the person that pays the bill for the cellular

22 service.

23 **INTERROGATORY NO. 19:**

24      Describe in detail any medical treatment you have received since January 1, 2015,

25 including mental health or psychiatric treatment, advice or counseling of any type, and

26 any treatment for alleged anxiety and depression described in Paragraph 35 of the

27 Complaint.

28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**INTERROGATORY NO. 20:**

Identify all medical providers for any treatment described in your response to Special Interrogatory No. 19.

**INTERROGATORY NO. 21:**

Describe all humiliation, embarrassment, annoyance, frustration, mental or emotional distress or similar type of injury you contend you suffered as a result of alleged acts of Allied as described in the Complaint.

**INTERROGATORY NO. 22:**

State all underlying facts in support of your contention that Allied used unfair or unconscionable means to collect a debt, as described in Paragraph 40(b) of the Complaint.

**INTERROGATORY NO. 23:**

State all underlying facts in support of your contention that Allied failed to comply with sections 1692b to 1692j of the FDCPA, as described in Paragraph 40(b) of the Complaint.

**INTERROGATORY NO. 24:**

State all underlying facts in support of your contention that Allied caused the telephone to ring repeatedly or continuously, as described in Paragraph 40(b) of the Complaint.

**INTERROGATORY NO. 25:**

State all underlying facts in support of your contention that Allied engaged in conduct the natural consequence of which is to harass, as described in Paragraph 40(b) of the Complaint.

DATED: April 23, 2019

**KATTEN MUCHIN ROSENMAN LLP**
Stuart M. Richter
Gregory S. Korman
Paul A. Grammatico


By:___/s/Paul A. Grammatico_____
Attorneys for defendant, Allied Interstate
LLC

5

**CERTIFICATE OF SERVICE**
*Henry Mendoza v. Allied Interstate, LLC and Synchrony Bank*
Case No: 8:17-cv-00885-JVS-KES

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Katten Muchin Rosenman LLP, 515 S. Flower Street, Suite 1000, Los Angeles, CA 90071. On April 23, 2019, I served the foregoing documents described as:

## DEFENDANT, ALLIED INTERSTATE LLC'S INTERROGATORIES TO PLAINTIFF (SET ONE)

| | |
|---|---|
| | I electronically filed the foregoing document using the CM/ECF system which automatically sends notification of such filing to all counsel of record and or parties in this case. |
| X | BY U.S. MAIL. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business to the address listed below:<br><br>Price Law Group APC<br>15760 Ventura Boulevard Suite 800<br>Encino, CA 91436<br>818-907-2030<br>Fax: 818-907-2122 |

I declare that I am employed in the office of a member of the bar of this Court and whose direction the service was made.

Executed on April 23, 2019 at Los Angeles, California.

Lora Anderson

# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

HENRY MENDOZA,

Plaintiff,

v.

ALLIED INTERSTATE, LLC,

Defendant.

Case No.: 8:17-CV-00885-JVS-KES
Hon. James V. Selna

PLAINTIFF'S RESPONSE TO
DEFENDANT ALLIED INTERSTATE,
LLC'S INTERROGATORIES TO
PLAINTIFF

## PRELIMINARY STATEMENT

It should be noted that this responding party has not fully completed investigation of the facts relating to this case and discovery is continuing in this action. All responses contained herein are based only upon such information and documents which are presently available to, and specifically known to, responding party.

It is anticipated that continuing discovery, independent investigation, legal research and analysis will supply additional facts resulting in further information and documents. The following responses are given without prejudice to this responding party's right to produce evidence of any subsequently discovered facts or documents. The responses contained herein are made in a good faith effort to supply information and documents presently in this responding party's custody, control, and/or possession or within her knowledge, but should in no way be to the prejudice of this responding party in relation to further discovery, research, and analysis.

## GENERAL OBJECTIONS

Plaintiff, Henry Mendoza, (hereinafter "Plaintiff") incorporated the following General Objections into his responses to each and every Interrogatory:

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

For each response to the Interrogatory of Admissions served concurrently with these responses that was not an unqualified admission, state all facts upon which you base each response.

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence.

### INTERROGATORY NO. 2:

Describe each and every communication that you had with Allied Interstate, LLC ("Allied"), including the date, time, and substance of each communication, and your physical location at the time of each communication.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome and not reasonably limited as to time or scope. Plaintiff also objects to this Interrogatory to the extent that the information is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff additionally objects because Plaintiff maintains the relevant information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objections, Plaintiff refers to the screen shots from his cell phone.

### REQUEST FOR PRODUCTION NO. 3:

Describe each and every communication that you had with any debt collector regarding the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit, including the date, time, and substance of each communication, and your physical location at the time of each communication.

- 3 -

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds that it is unduly burdensome and not reasonably limited as to time or scope. Plaintiff also objects to this Interrogatory to the extent that it seeks information that is nether relevant to a party's claim nor proportional to the needs of the case. Plaintiff additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objections, Plaintiff responds that calls made by Defendant from 8:00 am through 7:00 pm were during Plaintiff's work hours. Calls made to Plaintiff after 7:00 pm were received at home during family time hours.

## INTERROGATORY NO. 4:

When (meaning, please provide as specific a date as possible) were the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit opened?

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds that it seeks information that is nether relevant to a party's claim nor proportional to the needs of the case. Plaintiff additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain this information from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objection, Plaintiff responds as follows: Plaintiff opened the JC Penny account ending in 9002 on or around February, 2011. Plaintiff opened the JC Penny account ending in 3032 on or around November, 2013.

## REQUEST FOR PRODUCTION NO. 5:

When (meaning, please provide as specific a date as possible) did you become delinquent on the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit?

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds that it seeks information that is nether relevant to a party's claim nor proportional to the needs of the case. Plaintiff

- 4 -

additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain this information from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objection, Plaintiff answers as follows: Plaintiff became delinquent on the two JC Penny accounts on or around November of 2015.

## REQUEST FOR PRODUCTION NO. 6:

Why did you become delinquent on the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit?

**RESPONSE:** Plaintiff objects to this Interrogatory on the grounds that it seeks information that is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence. Subject to the aforementioned objections, Plaintiff answers as follows: Plaintiff is self employed and his income was reduced through his business.

## REQUEST FOR PRODUCTION NO. 7:

When (meaning, please provide as specific a date as possible) did any collection activity whatsoever, either by Synchrony Bank or another debt collector, begin against you with regard to the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit?

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that the information is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objections, Plaintiff answers as follows: Defendant began collection activity on or around April 2016.

**INTERROGATORY NO. 8:**

When (meaning, please provide as specific a date as possible) did you receive the first collection call with regard to the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit?

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that the information is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objections, Plaintiff answers as follows: Defendant began collection activity on or around April 2016.

**INTERROGATORY NO. 9:**

Describe all evidence you have regarding your contention that Allied was aware of any revocation of consent with regard to the two JC Penney accounts (3032 and 9002) that are the subject of this lawsuit.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that it is unduly burdensome and not reasonably limited as to time or scope. Plaintiff additionally objects because Plaintiff maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Subject to the aforementioned objections, Plaintiff does not possess any information related to the request in this Interrogatory and will supplement this response upon further discovery.

**INTERROGATORY NO. 10:**

State ever cellular phone number you contend that Allied called for which you seek recovery in this case.

- 6 -

## INTERROGATORY NO. 13:

If you contend that at any point you revoked consent for Allied to call you on your cellular phone, state when you revoked consent, how you revoked consent, and to whom you revoked consent.

**RESPONSE:** Plaintiff objects on the grounds that Defendant maintains the information sought is already in Defendant's possession or control, and as such Defendant may ascertain these documents from its own records or from other sources much more readily available to it than Plaintiff. Plaintiff responds as follows: Plaintiff revoked with Synchrony Bank who employed Defendant to collect on its behalf.

## INTERROGATORY NO. 14:

Identify all other lawsuits and court proceedings, including bankruptcy proceedings, in which you are or were a party, including for each suit the case number, the name of the court, the style of the case, and the subject matter of the case.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that the information is neither relevant to the subject matter of the action, nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this Interrogatory to the extent that the Interrogatory seeks information protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege. Subject to the aforementioned objections, Plaintiff answers as follows: Plaintiff was a party in *Henry Mendoza v. Allied Interstate, LLC and Synchrony Bank*, in the United States District Court Central District of California, Case No.: 8:17-cv-00885. The matter against Synchrony Bank was adjudicated in arbitration.

## INTERROGATORY NO. 15:

Identify all collection accounts for which you have been contacted by a collection agency or creditor for the past five (5) years.

- 8 -

**INTERROGATORY NO. 20:**

Identify all medical providers for any treatment described in your response to Special Interrogatory No. 19.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that it is, unduly burdensome and not reasonably limited as to scope. Plaintiff also objects to this Interrogatory to the extent that it seeks information that is not relevant to a party's claim, not proportional to the needs of the case and not reasonably calculated to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 21:**

Describe all humiliation, embarrassment, annoyance, frustration, mental or emotional distress or similar type of injury you contend you suffered as a result of alleged acts of Allied as described in the Complaint.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that it is, unduly burdensome and not reasonably limited as to scope or time. Subject to the aforementioned objections, Plaintiff answers as follows: Plaintiff received excessive amounts of phone calls from Defendant during work hours, often when he was with clients. Defendant's phone calls to Plaintiff during work hours disrupted his time with his clients, affected Plaintiff's work productivity, and was a source of great embarrassment for Plaintiff when his phone rang around clients and associates. Plaintiff additionally received large numbers of phone calls from Defendant often while he was with his family after works hours. These phone calls constantly interrupted Plaintiff and prevented him from enjoying and completing activities with his family. Defendant's calls additionally caused Plaintiff so much stress that he experienced numerous sleepless nights.

**INTERROGATORY NO. 22:**

State all underlying facts in support of your contention that Allied used unfair or unconscionable means to collect a debt, as described in Paragraph 40(b) of the Complaint.

- 11 -

<u>VERIFICATION</u>

I, *Henry Mendoza* being duly sworn, deposes and says that I am the plaintiff in this action, that I have read the foregoing answers to interrogatories and know the contents thereof, and the same are true to my knowledge, information and belief.

DATE:  5-24-19

Henry Mendoza

# EXHIBIT D

| Hello? |
| --- |

| Yes, Hello? |
| --- |

| Can I please speak with Henry Mendoza? |
| --- |

| Henry speaking. |
| --- |

| Hello, my name is Eugene. I am calling with Synchrony Bank. I need to let you know the entire call will be recorded and monitored. |
| --- |

| **[inaudible]** |
| --- |

| I am calling about your Walmart account, sir. |
| --- |

| Yeah, I can't talk now. Yeah. |
| --- |

| Okay sir, you did answer though, I wanted you to make sure that you know your account **[inaudible]** for $188.00. I don't want to take much of your time sir, do you know when you could make a payment to this account? |
| --- |

| No, I can't talk now actually. Please don't call me. |
| --- |

# EXHIBIT E

| |
|---|
| Hello? |
| Hello? |
| Yes, hello? |
| Hi, may I speak with Henry Mendoza? |
| Whom is calling? |
| Hello, my name is Sam, we are calling on a recorded line. |
| Okay, what's concerning? |
| We are calling on a personal business line. This is a call for Henry. |
| Oh, okay. Henry speaking. |
| Henry Mendoza? |
| Yes, it is. |
| Great, hi, hi Henry, my name is Sam, this entire call will be recorded and monitored. I'm calling in reference to your PayPal smart connect account with Synchrony Bank. Your PayPal account. |
| Yes, sir. |
| And $268.00 is the amount due with one past due with [**inaudible**] $25.00 on it. |
| Yeah, I can't really talk now actually, so. . . |
| Sorry? |
| I can't really talk no, so can you please not call me anymore? Thanks. |
| Sorry? |

# EXHIBIT F

## CONFIDENTIAL SETTLEMENT AGREEMENT

### I. PARTIES

This Confidential Settlement Agreement (the "Agreement") is made and entered into by and between Synchrony Bank ("Synchrony") and Henry Mendoza ("Claimant"). Synchrony and Claimant may be referred to individually as "Party" and collectively as "Parties."

### II. RECITALS

WHEREAS, certain disputes and controversies have arisen between the Parties hereto with respect to Claimant's JCPenney branded Synchrony credit card account ending in 9002 (the "9002 JCP Account"), JCPenney branded Synchrony credit card account ending in 3032 (the "3032 JCP Account") (collectively the 9002 JCP Account and the 3032 JCP Account shall be referred to as the "JCP Accounts"), Walmart branded Synchrony credit card account ending in 1086 (the "Walmart Account"), PayPal branded Synchrony credit card account ending in 3196 (the "Pay Pal Account"), TJX MasterCard branded Synchrony credit card account ending in 1731(the "TJX Account") (collectively the "Accounts"), styled *Henry Mendoza v. Allied Interstate, LLC, et al.*, filed in the United States District Court for the Central District of California (C.D. Cal.), Case No. 8:17-cv-00885 (the "Litigation"), and then, by joint stipulation, subsequently transferred into arbitration with the Judicial Arbitration and Mediation Services ("JAMS"), styled *Henry Mendoza v. Synchrony Bank*, at JAMS Reference No.: 1210035572 (the "Arbitration");

WHEREAS, Synchrony denies any and all liability and all unlawful or wrongful conduct alleged by Claimant in the Litigation and Arbitration, but the Parties nonetheless have concluded that it is in their best interests to avoid the further time, expense, burden and uncertainty of protracted litigation by settling their disagreements and disputes on the terms set forth herein; and

WHEREAS, pursuant to the terms and conditions of this Agreement, the Parties intend to fully and completely settle all claims, controversies, obligations and liabilities that were or could have been brought by Claimant in the Litigation, Arbitration or otherwise.

### III. GENERAL RELEASE and PROMISES

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions contained herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Recitals. The foregoing recitals are confirmed by the Parties as true and correct and are incorporated herein by reference. The recitals are a substantive and contractual part of this Agreement.

2.  Obligations of Claimant:

Page 1 of 9

deft's Exh 4
H. Mendoza
8/19/18 9 pgs.
J'ana Chaudhry, CSR 10845

a.    Release by Claimant. Claimant agrees not to sue and forever releases and discharges Synchrony, any third party who sought collection on behalf of Synchrony with the exception of Allied Interstate LLC ("Allied"), JCPenney, Walmart, TJX, PayPal, and former, present and future parents, subsidiaries and/or affiliates, whether direct or indirect, and any and all former, present and future officers, directors, employees, insurers, reinsurers, agents, assigns, representatives, predecessors, successors, legal representatives and all other persons acting on behalf of Synchrony, JCPenney, Walmart, TJX, and/or PayPal (the "Releasees") from any and all claims, demands, actions, causes of action, debts, accounts, accounting, and any other action or claim, either legal or equitable, which Claimant has, might have, or could hereafter have on account of any matter or thing related to Synchrony, JCPenney, Walmart, TJX, and/or PayPal, the Accounts, the Litigation, the Arbitration, or any underlying facts, which exist as of the date this agreement was executed by Plaintiff and delivered to Defendant.

Claimant hereby acknowledges that Claimant may hereafter discover facts different from, or in addition to, those which Claimant now claims or believes to be true with respect to the claims released herein, and agrees that this Agreement shall be and remain effective in all respects notwithstanding the discovery of such different or additional facts with respect to the claims released herein. In furtherance of the release given above, Claimant hereby acknowledges that he is knowingly and voluntarily waiving his rights under Section 1542 of the California Civil Code to the full extent that he may lawfully waive all such rights and benefits pertaining to the subject matter hereof, and that the consequences of such waiver have been explained to it by Claimant's counsel. Claimant acknowledges that Claimant is familiar with the provisions of Section 1542, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete waiver/release in accordance with the terms set forth above, Claimant expressly acknowledges that this release is intended to include in its scope all claims against the Releasees arising from the present dispute which Claimant does not know or suspect to exist in his favor at the time of execution of this Agreement, and that this release contemplates the extinguishment of any such claim or claims.

The Parties acknowledge that this Agreement and Release are not

4-2

intended to include any claims that Plaintiff may have against Allied
Interstate LLC.

b.    Dismissal of Litigation and Arbitration with Prejudice.  Within three (3)
business days of the payment set forth in Section three (3) below,
Claimant shall deliver to counsel for Synchrony an endorsed proposed
Order dismissing Claimant's claims against Synchrony in the Litigation
and Arbitration in their entirety with prejudice and/or make such other
filing with the C.D. Cal. and JAMS as is necessary to request dismissal of
Claimant's claims against Synchrony in the Litigation and Arbitration in
their entirety with prejudice, and withdraw any related claims pending
before any tribunals, courts or administrative bodies.  Claimant shall cause
a copy of the request for dismissal with prejudice of the Litigation and
Arbitration to be delivered to counsel for Synchrony.

3.    Obligations of Synchrony:

a.    Settlement Payment.  In consideration for Claimant's promises and
covenants contained herein, Synchrony agrees to pay Claimant the sum of
Twenty-Two Thousand Sixteen Dollars and Sixty-Two Cents
($22,016.62) in the form of a single settlement check, which shall be given
in trust and made payable to Price Law Group, APC at 6345 Balboa Blvd.,
Suite 247, Encino, CA 91316, within 30 days of receipt of both (i) a fully
executed copy of this Agreement and (ii) a copy of a W-9 form (current
IRS version) completed by Claimant and another by the payee.

b.    Account Credits and Account Closure.  In further consideration for
Claimant's promises and covenants contained herein, Synchrony agrees to
apply an account credit to Claimant's Accounts as follows:

i.    Synchrony will apply an account credit of One Thousand Forty-
Three Dollars and Fifty-Two Cents ($1,043.52) to Claimant's
3032 JCP Account. Claimant remains responsible for any balance
after the credit is applied, including but not limited to changes
from any recent or subsequent purchases, payments, fees, or
interest. If this credit reduces the account to a zero balance, the
account will be closed.

ii.   Synchrony will apply an account credit of Two Thousand Eight
Hundred Twenty-Two Dollars and Fifty-Three Cents ($2,822.53)
to Claimant's 9002 JCP Account. Claimant remains responsible
for any balance after the credit is applied, including but not
limited to changes from any recent or subsequent purchases,
payments, fees, or interest. If this credit reduces the account to a
zero balance, the account will be closed.

4-3

c.    Synchrony will apply the credits referenced herein within 30 days of receipt of a fully executed copy of this Agreement. Synchrony also agrees to close any of the Accounts reduced to a zero balance by the application of the account credits referenced herein within 30 days of receipt of a fully executed copy of this Agreement. Nothing herein shall alter or amend the terms of any cardholder agreement for any credit card account of Claimant with Synchrony that is not closed under the terms of this Agreement.

d.    Credit Reporting. Synchrony shall, if not already done, request, by electronically submitting a Universal Data Form ("UDF") or by other similar means, the deletion of any credit reporting of the JCP Accounts concerning Plaintiff by Synchrony to any or all of the following Consumer Reporting Agencies ("CRAs") to which it reports relating to the JCP Accounts, including Equifax Information Services LLC; Experian Information Solutions, Inc.; Trans Union LLC; and Innovis Data Solutions, Inc.

   i.    Plaintiff acknowledges that it may take up to sixty (60) days for the CRAs to update Plaintiff's credit history. If at any time following sixty (60) days after execution of this Agreement by the Parties, Plaintiff determines that one or more of the CRAs have not complied with Synchrony's request as set forth above, Plaintiff agrees to provide prompt written notice to Timothy Relich, 20 Stanwix Street, Suite 1200, Pittsburgh PA 15222, and Joline White, Synchrony Financial, 900 Concourse Drive, Rapid City, SD 57703 and provide copies of the report of any CRAs for which Plaintiff contends the reporting of the Account does not comply with Synchrony's request. In that event, Synchrony will, within thirty (30) business days following receipt of such notice and report(s), request again that the CRAs update Plaintiff's credit reports in the manner previously requested. Plaintiff agrees that Plaintiff's redress under the provisions of this paragraph shall be Plaintiff's sole remedy, provided that Synchrony, after receiving notice from Plaintiff, resubmits the requests described above within the timeframe set forth in this Paragraph.

e.    Plaintiff further acknowledges that Synchrony does not control the contents of credit reports prepared and issued by any CRAs or what is reported to the CRAs by any subsequent owner or servicer of the JCP Accounts after Synchrony sold the same. To the extent that Synchrony complies with this Agreement and notifies the CRAs as agreed herein, Plaintiff agrees to hold Synchrony harmless in the event any CRAs do not properly update the reporting.

4-4

## IV.   REPRESENTATIONS, WARRANTIES and OTHER TERMS

4.      Entire Agreement.  This Agreement constitutes the entire agreement and understanding between the Parties, and supersedes any and all prior oral and written agreements and understandings.  No representation, warranty, condition, understanding or agreement of any kind with respect to the subject matter shall be relied upon by them except those contained herein.  Nothing herein shall alter or amend the terms of any cardholder agreement for any credit card account of Claimant with Synchrony that is not closed under the terms of this Agreement.

5.      Modification.  No provision of this Agreement may be waived, amended or modified in any respect whatsoever, except by written agreement signed by the Parties.

6.      Severability.  If any provision of this Agreement is held to be invalid, void or unenforceable, all other provisions of this Agreement nevertheless will remain in full force and effect.

7.      Full Authority.  The Parties represent that they have full authority to enter into this Agreement, and that they are competent and over the age of majority.

8.      Terms Read and Understood.  Each Party represents that it has carefully read and fully understands the terms, conditions, legal effects and intent of this Agreement, and that it has had the opportunity to consult with independent legal counsel.  Each Party acknowledges that it received a copy of this Agreement before signing it, and that it understands that every provision of this Agreement is contractual and legally binding.

9.      No Duress.  Each Party agrees to sign this Agreement as its own voluntary act and deed, and represents that such execution was not the result of any duress, coercion or undue influence.

10.     No Admissions.  The Parties acknowledge and agree that this Agreement is a compromise settlement of disputed claims, and that the sums and covenants given in consideration of this Agreement, as well as the execution of this Agreement and the actions taken pursuant to this Agreement, shall not be construed to be an admission of fault or liability on the part of any Party with respect to the Litigation or Arbitration, the Accounts, or the disputed matters set forth above.

11.     No Representations.  Each Party represents and warrants that no representations made by the other party about the nature and extent of the claims, damages, losses, injuries, legal liability, or financial responsibility, if any, have induced it to enter into this Agreement.  In agreeing to the terms and conditions of this Agreement, each Party represents and warrants that it has considered not only all known facts, damages and losses, but also the fact that consequences not now known may result from occurrences or events that may have given rise to the claims released in this Agreement.

12.     Parties to Bear Own Costs and Attorney's Fees.  Each Party will bear its own costs, expenses, and claims to interest and attorneys' fees, whether taxable or otherwise, incurred in or arising out of, or in any way connected with, the matters which are referenced or covered in the release referenced above or which are otherwise related to the subject of this Agreement.

Page 5 of 9

4-5

13. Confidentiality. As further consideration for the payment of the sums mentioned above and for other good and valuable consideration, Claimant agrees that Claimant and Claimant's attorney(s) will not at any time disclose, reveal, or divulge the terms of this Agreement, including but not limited to, the amount of payment recited herein, the source or sources of settlement funds, and the basis on which said payments are computed, to any person, firm, corporation, or any entity whatsoever, other than (1) to appropriate governmental taxing authorities and accountants and tax advisors, if any, who prepare tax returns for Claimant; (2) with the other Parties express, written consent; or (3) if subpoenaed or ordered by a court, provided that the non-disclosing Parties are given at least ten calendar days' notice to assert any objections prior to the testimony or production of this Agreement by Claimant. Claimant agrees to waive any objection to the non-disclosing Party's request that the document production or testimony be done *in camera* and under seal. Furthermore, Claimant and Claimant's counsel shall not post or otherwise disclose or reveal to any person or entity any Information on the Internet or any other media outlet, including but not limited to websites or newspapers, email, Facebook, MySpace, and Twitter.

14. Non-disparagement. Claimant represents and warrants, on behalf of Claimant, Claimant's heirs, and agents, that they shall refrain from publishing, in writing or verbally, any disparaging comments about Synchrony, or Synchrony's officers, directors, employees and attorneys ("Disparaging Statements"). Claimant further covenants and agrees that any and all Disparaging Statements currently posted on any website, webpage, weblog and/or otherwise accessible on the internet, shall be removed within seven (7) days of execution of this Agreement.

15. No Assignment. Claimant warrants and represents that Claimant is the owner of all claims sought to be released herein, and that none of the claims or causes of action relating to the Litigation or Arbitration have been sold, or assigned, or otherwise disposed of, either voluntarily or involuntarily. Claimant further agrees to indemnify, defend and hold harmless the Releasee(s) from and against any losses, damages, attorneys' fees, costs of suit and expenses arising out of any claim made or action instituted by any person or entity who claims to be the beneficiary of such assignment or transfer, and to pay and satisfy any judgment or settlement resulting from such claim or action.

16. Successors and Assigns. The provisions of this Agreement shall be binding and inure to the benefit of each of the Parties and their respective heirs, executors, administrators, agents, representatives, successors and assigns.

17. Governing Law. This Agreement shall be interpreted, enforced and governed in accordance with the laws of the State of California, regardless of any conflicts-of-laws principles.

18. Tax Consequences. Claimant acknowledges that Claimant has not sought, received, or relied on Synchrony, Synchrony's counsel or any agent of Synchrony for any tax advice of any kind with respect to the effects of this Agreement or the delivery of any consideration, monetary or otherwise identified herein. Synchrony may be required to file certain IRS Form(s) 1099 or other information returns with the Internal Revenue Service with respect to any consideration provided to Claimant as part of this Agreement. Furthermore, to the

4-6

extent required by applicable law, Synchrony will impose withholding on any such consideration and file information returns with the relevant tax authorities as required. Claimant has been advised to consult with tax counsel of Claimant's own choice to seek legal and/or tax advice regarding the tax consequences of any such consideration.

19.     Ambiguities. Each of the Parties have reviewed this Agreement, and agree that the rule of interpretation stating that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

20.     Counterparts and Facsimile Signatures. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Electronic, pdf or fax signatures shall be considered original signatures.

21.     Headings. The headings of this Agreement are for convenience or reference only, and shall not limit, expand, modify or otherwise affect the meaning of any provision of this Agreement.

**[remainder of page intentionally blank]**

4-7

Date Executed: 12-17-18

Henry Mendoza

Henry Mendoza
Printed Name

[remainder of page intentionally blank]

4-B

Date Executed: Jan 3, 2019

SYNCHRONY BANK

By: _____
Eric Berkowitz (Jan 3, 2019)

Eric Berkowitz, Senior Counsel

4-9